IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| Franklin D. Azar & Associates, P.C., | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | Civil Action No. 4:17-cv-418 |
| | § | |
| Jerry L. Bryant, Coety Layne Bryant | § | (Jury trial demanded) |
| a/k/a Cody Bryant a/k/a Coty Bryant | § | |
| a/k/a Kody Bryant,  Deanna Bryant, | § | |
| Lauren Von Atkinson McNeil a/k/a | § | |
| Lauren Von McNeil a/k/a Lauren Von | § | |
| Atkinson a/k/a Lauren Atkinson, | § | |
| Daniel McNeil, Brad Johnson, Tiffany | § | |
| Averitte, Paseo Miramar, Inc., | § | |
| Exclusive Legal Marketing, Inc., | § | |
| and Prime Legal Leads, LLC, | § | |
| | § | |
| **Defendants** | § | |

---

## PLAINTIFF'S COMPLAINT TO AVOID FRAUDULENT TRANSFERS, FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Plaintiff, Franklin D. Azar & Associates, PC ("***Azar & Associates***"),  judgment creditor, complains of defendants, Jerry L. Bryant ("***Jerry Bryant***" or "***Jerry***" or "***Bryant***"), Coety Bryant a/k/a Cody Bryant a/k/a Coty Bryant a/k/a Kody Bryant ("***Coety Bryant***" or "***Coety***"), Deana Bryant, Lauren Von Atkinson McNeil a/k/a Lauren Von McNeil a/k/a Lauren Von Atkinson a/k/a Lauren Atkinson ("***Lauren Atkinson***" or "***Lauren***"), Daniel McNeil, Brad Johnston, Tiffany Averitte, Paseo Miramar, Inc. a/k/a Paseo Miramar Pictures a/k/a Paseo Miramar Studios ("***Paseo***"), Exclusive Legal

Marketing, Inc. ("*Exclusive*"), and Prime Legal Leads, LLC ("*Prime*"), and would respectfully show the Court as follows:

## I. PARTIES

1.      Plaintiff Azar & Associates is a professional corporation organized under the laws of the State of Colorado with its principal place of business in Aurora, Colorado.

2.      Defendant Jerry L. Bryant is a citizen of the State of California, residing at 1168 S. Barrington Ave., Apt. 604, Los Angeles, California 90049, where he may be served with process.

3.      Defendant Coety Layne Bryant a/k/a Cody Bryant a/k/a Coty Bryant a/k/a Kody Bryant is a citizen of the State of Texas, residing at 2314 Sleepy Hollow Trail, Frisco, Texas 75033 (the "*Frisco Address*"), where he may be served with process.

4.      Defendant Deana Bryant is a citizen of the State of Texas, residing at the Frisco Address, where she may be served with process.

5.      Defendant Lauren Von Atkinson McNeil a/k/a Lauren Von McNeil a/k/a Lauren Von Atkinson a/k/a Lauren Atkinson is a citizen of the State of Oklahoma, residing at 2576 Forest Glen Dr., Choctaw, Oklahoma 73020, where she may be served with process.

6.      Defendant Daniel McNeil is a citizen of the State of Oklahoma, residing at 2576 Forest Glen Dr., Choctaw, Oklahoma 73020, where he may be served with process.

7.      Defendant Brad Johnson is a citizen of the State of Texas, residing at residing at 1118 Ash St., Irving, Texas 75060, where he may be served with process.

8.      Defendant Tiffany Averitte is a citizen of the State of Texas, residing at 1118 Ash St., Irving, Texas 75060, where she may be served with process.

2

9. Defendant Paseo Miramar, Inc. a/k/a Paseo Miramar Pictures a/k/a Paseo Miramar Studios is corporation organized under the laws of the State of Texas with its principal place of business in Plano, Texas.  It may be served by serving its registered agent Legalinc Corporate Services, Inc., at the registered agent's address of 5850 Granite Parkway, Suite 215, Plano, Texas 75024.

10. Defendant Exclusive Legal Marketing, Inc. is corporation organized under the laws of the State of Texas with its principal place of business in Plano, Texas.  It may be served by serving its registered agent and President, Coety Bryant, at 5601 Granite Parkway, Plano Texas 75024 or at the Frisco Address.

11. Defendant Prime Legal Leads, LLC is a limited liability corporation formed under the laws of the State of Texas with its principal place of business in Plano, Texas.  It may be served by serving its registered agent Legalinc Corporate Services, Inc., at the registered agent's address of 5850 Granite Parkway, Suite 215, Plano, Texas 75024.

## II. JURISDICTION, STANDING, AND VENUE

12. This Court has subject matter jurisdiction of this proceeding pursuant to 28 U.S.C § 1332(a) as the amount in controversy in this matter exceeds $75,000 and the dispute is between citizens of different States.

13. Azar & Associates has standing to bring this action because Linda S. Payne, Chapter 7 Trustee of PI Advertising, Inc. in Case No. 14-42005; *In re: PI Advertising, Inc.*, In the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "***PI Bankruptcy***") assigned to Azar & Associates claims and rights to estate property pursuant to an Asset Purchase Agreement dated June 1, 2016, (the "***PI APA***").  The "Order Granting Trustee's Motion to Approve Sale of Assets,"

entered July 6, 2016 in the PI Bankruptcy, is attached as Exhibit A to this Complaint. Additionally, Azar & Associates has standing to bring this action because Linda S. Payne, Chapter 7 Trustee of Jerry L. Bryant in Case No. 14-42272; *In re: Jerry L. Bryant*; In the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "***Bryant Bankruptcy***") assigned to Azar & Associates certain claims and rights to estate property pursuant to an Asset Purchase Agreement dated June 1, 2016 (the "***Bryant APA***"). The "Order Granting Trustee's Motion to Approve Sale of Assets," entered July 6, 2016, in the Bryant Bankruptcy, is attached as Exhibit B to this Complaint. As Azar & Associates has purchased these claims and rights, it is now able to pursue claims it could have pursued under state law prior to the filing of the bankruptcies and to recover property it now owns.

14.     Venue is proper in this district pursuant to 11 U.S.C. §§ 1391(a)(1) & (2).

### III.  OVERVIEW OF THE COMPLAINT

15.     As explained below in detail, in April 2012, Azar & Associates obtained a $1,000,000 judgment (the "***Judgment***," as further defined below) in Texas state district court against Jerry Bryant and PI Advertising, Inc., a Texas corporation solely owned and controlled by Jerry Bryant, who was its President.

16.     In February 2014, Azar & Associates, through the undersigned counsel, initiated discovery to enable collection of the judgment. This led to an extended discovery battle that ultimately ending with Bryant being held in contempt and being forced to produce contracts between PI Advertising and its key clients.

17.      In March 2014, Azar & Associates garnished PI Advertising's bank accounts at Frost Bank. After learning of the garnishment, Jerry Bryant caused PI

Advertising to thereafter deposit the income it received from its operations into a joint banking account held by Coety Bryant and Lauren Atkinson at Frost Bank, and not into PI Advertising's own bank accounts.   The purpose of these transfers, ***as expressly admitted by Jerry Bryant,*** was to prevent Azar & Associates from collecting the Judgment.    Thus, as further explained, these transfers, which are in excess of $1,000,000.00, may be avoided as actual and constructive fraudulent transfers.

18.    In August 2014, after Jerry Bryant was held in contempt and forced to turn over contracts between PI Advertising and its clients, he and his brother, Coety Bryant, conspired to form Exclusive Legal Marketing, Inc. to continue the business of PI Advertising under a pseudonym.   Exclusive was formed on August 6, 2014, ***two days after the date the contempt order required Jerry Bryant to turn over the PI Advertising contracts and within 24 hours of Bryant's compliance with the contempt order.***

19.    Exclusive was formed so that it could continue to service PI Advertising's existing clients, while PI Advertising filed for bankruptcy, and so it would look like Jerry no longer owned the business.  As Exclusive was formed to perpetrate a fraud, it is the alter ego of PI Advertising.  PI Advertising filed for bankruptcy on September 22, 2014.

20.    Jerry Bryant subsequently filed for bankruptcy on October 28, 2014. However, his discharge was denied on November 13, 2015, by an agreed final judgment entered in an adversary proceeding brought by the United States Trustee seeking to block Jerry's discharge under multiple provisions of the Bankruptcy Code.

21.    In April 2016, Prime Legal Leads, LLC was formed by Deana Bryant, Coety Bryant's wife, in response to two lawsuits against Exclusive by former clients of PI Advertising who became clients of Exclusive. ***Prime was formed only five days after***

*Exclusive filed its answer in response one of the lawsuits.*  It will be shown that Prime is nothing more than the third verse of the same song, and that it too is the alter ego of PI Advertising.

22.     Similarly, Coety formed Paseo Miramar, Inc. in May 2014, within 90 days of Azar & Associates initiating discovery efforts and shortly after the garnishment of PI Advertising's bank accounts.  Paseo was formed to prevent Azar & Associates from seizing rights held by Jerry Bryant to a movie, "American Justice," which Jerry had written and produced, and a movie script he had written.

23.     All of the defendants have participated in some way in either transferring or secreting assets of PI Advertising or Jerry Bryant, or are subsequent transferees of such assets, or otherwise conspired to prevent Azar & Associates from collecting the Judgment.

## IV. FACTUAL AND PROCEDURAL BACKGROUND

### <u>The Judgment Against Bryant and PI Advertising</u>

24.     On April 3, 2012, the M-298th Judicial District Court of Dallas County, Texas (the "***State Court***"), in Cause No. DC-11-07068; styled *Brian Loncar, P.C. and Franklin D. Azar & Associates, P.C. v. IMGRP Productions, Inc., PI Advertising, Inc., Law Ads, Inc. and Jerry Bryant* (the "***State Court Case***")**,** signed its Final Judgment (the "***Judgment***"), in the principal amount of $1,000,000.00, in favor of Azar & Associates, and against IMGRP Productions, Inc., PI Advertising, Inc., Law Ads, Inc. and Jerry Bryant (collectively, the "***judgment debtors***"), jointly and severally. The Judgment bears postjudgment interest under Texas law.  The Judgment also contained a separate award in

the principal amount of $230,000 in favor Brian Loncar, P.C. against the judgment debtors.

<strong><u>Early Discovery Efforts</u></strong>

25.     On July 19, 2012, Azar & Associates served postjudgment discovery on the judgment debtors in the State Court Case, including interrogatories, requests for production, and requests for admission, and also noticed Jerry Bryant's postjudgment deposition for September 5, 2012.

26.     In response, forty days later, on August 29, 2012, Bryant filed "Defendant Jerry Bryant's Emergency Motion For Protective Order" (the "***Protection Motion***").  By his Protection Motion, Jerry claimed that the Judgment had been obtained without proper notice, that he had no knowledge of the Judgment until the discovery requests were served in July 2012, and that, assuming arguendo that the Judgment was valid, by its terms the Judgment was not "'due and payable' until June 6, 2013...."  Accordingly, Jerry argued that discovery into his finances should not be allowed until after June 6, 2013.

27.     No order was ever entered by the State Court on the Protection Motion. However, the deposition did not take place in 2012, nor did Jerry Bryant or the other judgment debtors produce any of the requested documents.

<strong><u>The 2014 Deposition Notice and State Court Orders Prior to the Contempt Order</u></strong>

28.     On February 6, 2014, Azar & Associates, through the undersigned counsel, renewed its efforts to collect the Judgment by noticing the postjudgment deposition of Bryant for March 13, 2014 (the "***Deposition Notice***").  The Deposition Notice was accompanied by a subpoena duces tecum requesting the production of 44

7

categories of financial documents, including documents relating to the value of the other judgment debtors, including PI Advertising.

29.     On February 10, 2014, a motion to quash the Deposition Notice was filed by Bryant's counsel.

30.     On March 6, 2014, after hearing, the State Court signed its "Order Granting Judgment Creditor's Motion to Compel Deposition of Jerry Bryant" (the "***First Order Compelling Deposition***"), in the State Court Case ordering Bryant to appear for his deposition in Dallas on March 13, 2014, and ordering him to produce to counsel for Azar & Associates "all documents responsive to the subpoena duces tecum attached as Exhibit A" to the Deposition Notice.

31.     Bryant failed to appear for his deposition on March 13, 2014. He also failed to produce any documents.

32.     On March 24, 2014, Azar & Associates moved to hold Jerry Bryant in contempt (the "***First Contempt Motion***") for violating the First Order Compelling Deposition.

33.     On April 21, 2014, the State Court signed an "Order To Show Cause" (the "***First Show Cause Order***") requiring Jerry Bryant to appear on May 23, 2014, and show cause why he should not be held in contempt for failing to comply with the March Order.

34.     Bryant deliberately evaded service of the First Show Cause Order.  He did not appear on May 23, 2014, for the show cause hearing.  The State Court then signed, on May 23, 2014, an additional "Order to Show Cause" (the "***Second Show Cause Order***"), requiring Bryant to appear before the State Court on July 11, 2014, and show cause why he should not be held in contempt for failing to comply with the First Show Cause Order.

35.    Additionally, on June 24, 2014, the Court signed an "Order Compelling The Deposition Of Jerry Bryant" (the "***Second Order Compelling Deposition***"), which required him to appear for his deposition on a weekday before July 11, 2014 (the show cause hearing date).  The Second Order Compelling Deposition also ordered Bryant to produce "all documents responsive to the subpoena duces tecum attached as Exhibit A" to the Deposition Notice "***at least three days prior*** to the date on which Bryant appears for his deposition."(Emphasis in original.)

### The PI Advertising Contracts

36.    Although Jerry Bryant did produce some documents and did appear for his deposition on July 10, 2014, in Dallas, Texas, as ordered, he failed to fully comply with the State Court's orders.  Specifically, he failed to produce certain documents that would have been responsive to the Deposition Notice, and refused to testify regarding PI Advertising' contracts with personal injury law firms that were the principal clients of PI Advertising.  Most importantly, he failed to produce the written contracts between PI Advertising and its key clients (the "***Contracts***"), which would have shown the identity of those clients.

37.    The reason why the failure to produce the Contracts was so important is that in 2014 PI Advertising was generating over $100,000.00 and sometimes over $200,000.00 a month under the Contracts.

38.     In PI Advertising's Statement of Financial Affairs filed in its bankruptcy on October 17, 2014 (docket #7, p. 18), signed by Jerry Bryant as PI Advertising's President, PI Advertising represented that it had gross income in 2013 of approximately $1,900,000 and had gross income as of the filing date in 2014 of approximately

9

$1,600,000. Based on this estimate for 2014, PI Advertising was grossing an average of approximately $178,000 a month in 2014.

39.    Had Azar & Associates been able to learn the identity of PI Advertising's clients, it would have seized the income streams flowing from those Contracts.[1] Jerry Bryant was clearly concerned that Azar & Associates would seize the income stream from the Contracts by turnover order or garnishment, so Bryant deliberately failed to comply with the State Court's orders to prevent Azar & Associates from learning the identities of PI Advertising's clients.

## The Contempt Order

40.    As evidenced by process server affidavits filed in July 2014 in the State Court Case, Bryant again attempted to evade service of the State Court's orders, thereby requiring multiple stake-outs to effectuate service.  Eventually, however, he was served on July 7, 2014,with both the Second Show Cause Order and the Second Order Compelling Deposition.

41.    On July 11, 2014, Azar & Associates filed an amended motion to hold Bryant in contempt for failing to produce all of the requested documents, and for refusing to testify in his July 10, 2014, deposition regarding the Contracts and other matters (the "*Amended Contempt Motion*").

42.    On July 24, 2014, the State Court held a hearing on First Contempt Motion and the Amended Contempt Motion and found Bryant to be in contempt of court for violating both the First Order Compelling Deposition and the Second Order

---

[1] By July 2014, Azar & Associates had already registered the Judgment in the State of California, and subsequently registered the Judgment in the State of Arkansas, the State of Mississippi, and the State of South Carolina.  This registration process came to a halt when Exclusive was formed as the alter ego of PI Advertising.

Compelling Deposition. By its order signed July 24, 2014, the day of the contempt hearing (the "**Contempt Order**"), the State Court ordered Bryant to produce multiple documents (the "**Missing Documents**," as that term is used in the Contempt Order), including the Contracts, **by no later than August 4, 2014 at 5:00 p.m.**  Additionally, he was ordered to appear for the continuation of his deposition and ordered:

> [T]o answer all questions posed to him during the continuation of his deposition related to PI Advertising, Inc. ("**PI Advertising**"), its clients, their identities, the contracts of PI Advertising, the sum of monies flowing from those contracts or other periodic jobs performed by PI Advertising, the timing of payments to be received from clients of PI Advertising, and any other inquiries of any nature relating in any way to the finances, assets, liabilities, income, expenses or cash flow of PI Advertising.

Contempt Order, p. 5.

43.     By the Contempt Order, the State Court was providing Bryant with one last chance to comply before placing Bryant in custody until such time as he complied with the State Court's discovery orders.  Bryant knew that if he did not comply with the Contempt Order, he would almost certainly be placed in custody.

44.     Although the deadline under the Contempt Order to produce the Missing Documents was August 4, 2014, *Bryant did not produce any of the Contracts until the afternoon of August 5, 2014.*  He produced four Contracts on August 5, 2014. *And it was not until the morning of August 6, 2014, that he produced a fifth Contract — the Contract between PI Advertising and Morris Bart, a personal injury lawyer in Louisiana.*  On information and belief, the Morris Bart Contract was one of the most lucrative Contracts as it called for payment(s) of $30,000 a month to PI Advertising.

## The Formation of Exclusive and the Exclusive Transfers

45.     *On the very day that the Morris Bart Contract was produced*, and less than 24 hours after the other four Contracts that were produced, *Exclusive Legal Marketing, Inc. was formed by the filing of a Certificate of Formation with the Texas Secretary of State's office.*

46.     Coety and Jerry conspired to form Exclusive, and caused Exclusive to be formed, to carry on the business of PI Advertising under the name of a different entity in order to prevent Azar & Associates from collecting the Judgment by seizing the sums flowing to PI Advertising under the Contracts.  Consequently, Exclusive was formed to perpetrate a fraud.

47.     After its formation, Exclusive carried on exactly the same business as PI Advertising.

48.     In her declaration ("*Declaration*"), dated September 30, 2015, in her divorce proceeding presently pending in California, Jessica Bryant, Jerry Bryant's wife, stated under oath (emphasis added):

•     "*Jerry  … has an advertising company, Exclusive Legal Marketing, which he recently transferred to his brother's name, but will transfer back once he has finalized a pending lawsuit.*"

•     "Through Exclusive Legal Marketing, Jerry pays all of our household expenses, which I estimate to be at least $32,000 [per month]."

49.     Lauren Atkinson, the office manager and accountant for PI Advertising,[2] in her affidavit in a Texas state court lawsuit[3] filed against her and her husband, Daniel McNeil, by Exclusive stated on her oath (emphasis added):

[2] Lauren and/or Coety were employees of PI Advertising given the control Jerry Bryant exercised over their actions as President of PI Advertising, and they were paid regular monthly payments. However, for tax purposes PI Advertising treated them as independent contractors.
[3] Case No. 416-03463-2016; styled *Exclusive Legal Marketing, Inc. v. Lauren Von Mc Neil et. al*; in the 416th Judicial District Court of Collin County, Texas (the "*McNeil Suit*").   The affidavit

- "I was the office manager of the Plaintiff, Exclusive Legal Marketing, Inc. ("ELMI"), between September 2014 and April 2016 and was a W-2 employee in that role.  My duties included assisting with search engine optimization ("SEO") and competitive bidding services for pay-per-click advertising sold to law firms seeking advertising to individuals involved in personal injury accidents.  As office manager, I also handled the bookkeeping and payment of payroll and expenses for ELMI."

- "Prior to acting as the office manager of ELMI, I had been hired as an independent contractor by Jerry Bryant to assist his company, PI Advertising, with *nearly identical SEO and pay-per-click services.  PI Advertising engaged in nearly the exact same business model as ELMI."*

- PI Advertising filed bankruptcy in … 2014 due to outstanding liabilities.  At or around the time of the Bankruptcy, ELMI was organized, and *I was employed by Coety Bryant to perform the same services I performed at PI Advertising*."

50.     Exclusive operated out of the offices rented by PI Advertising on Granite Parkway in Plano, Texas (the "*Leased Premises*"). The lease between PI Advertising and the landlord of the office building required the landlord to approve any sublet of the Leased Premises.  However, neither Exclusive not PI Advertising sought such permission from the landlord of the Leased Premises.  Instead, Exclusive simply started paying rent for the Leased Premises to the landlord instead of PI Advertising.

51.     On or about the time that Exclusive was formed, Jerry Bryant contacted each of PI Advertising's clients by telephone and told each client that their Contracts were going to performed thereafter by Exclusive, that Exclusive was servicing PI Advertising's business, and that *the clients should stop paying PI Advertising and start paying Exclusive.*   The telephone calls made by Jerry Bryant to divert PI Advertising's income to Exclusive, together with the formation of Exclusive and the operation of PI

---

was signed by her as Lauren Von McNeil.  Exclusive's claims in the McNeil Suit are based on fraud (embezzlement), breach of fiduciary duty, and misappropriation of trade secrets. On information and belief, the McNeil Suit is still pending.

Advertising's business thereafter by Exclusive, PI Advertising's alter ego, are collectively referred to as the *"Exclusive Transfers."*

52.    Bryant has admitted in sworn testimony that five of PI Advertising's clients did business with Exclusive for some period of time after it was formed: John Foy, Darryl Isaacs, Bill Green, Richard Schwartz, and Morris Bart.[4]  The five PI Advertising Contracts produced by Bryant were with Darryl Isaacs, Bill Green, Richard Swartz, David Gruber, and Morris Bart.  On information and belief, PI Advertising had a written Contract with John Foy but Bryant failed to produce the Contract as required by the Contempt Order.

53.  Over time, Exclusive worked for other personal injury attorney clients other than the attorneys who had Contracts with PI Advertising.  On information and belief, all of these clients would have been the clients of PI Advertising, but for the Exclusive Transfers.

### The Exclusive Transfers were Actually and Constructively Fraudulent

54.    The Exclusive Transfers were made with actual intent to hinder, delay or defraud PI Advertising's creditors, including, without limitation, Azar & Associates.

55.    The Exclusive Transfers were each made by PI Advertising without receiving reasonably equivalent value in exchange for the transfers.  In fact, no consideration of any kind was paid by Exclusive to PI Advertising in return for any of the Exclusive Transfers.

56.     Further, PI was insolvent at the times of the Exclusive Transfers or became insolvent as a result of the Exclusive Transfers.

---

[4] The Contracts with these attorneys were with their law firms, but these references in the complaint are to the principals of the firms.

57.    Further, at the times of the Exclusive Transfers, PI Advertising (i) was engaged in a business for which its remaining assets were unreasonably small in relation to its business, or (ii) PI Advertising intended to incur, or believed, or should have believed, that it would incur debts beyond his ability to pay as they became due.

58.    At the times of the Exclusive Transfers, PI Advertising was not generally paying his debts as they became due.

59.     The amount of income received by Exclusive after the Exclusive Transfers, including the income received under the Contracts, is presently unknown to Azar & Associates.   Exclusive's bank account statements are not in Azar & Associates' possession.  However, based on the average monthly income generated by PI Advertising during the 12 months prior to the formation of Exclusive, Azar & Associates asserts that the value of the Exclusive Transfers is in excess of $2,000,000.00.

60.    Further, on information and belief, Coety Bryant, and his wife, Deana Bryant, Lauren Atkinson, and her husband, Daniel McNeil, and Tiffany Averitte, and her husband, Brad Johnson, are subsequent transferees of the Exclusive Transfers.   In this regard, but without limitation, Lauren, by her own admission, assumed "the same" role as she held at PI Advertising as an employee of Exclusive. Daniel McNeil was also an employee of Exclusive, and, on information and belief, was aware of and benefitted from the Exclusive Transfers.

**The Service of the Writ of Execution on PI Advertising and Its Bankruptcy Filing**

61.    On September 22, 2014, Chief Deputy Constable Mike Missildine of the Collin County Constable's office served a writ of execution under the Judgment on PI Advertising at the Leased Premises.  When he arrived, he noticed that the name of the

door now read Exclusive Legal Marketing, and called the undersigned counsel to determine whether to go forward with the execution. He was advised to do so, and called for a locksmith to change the lock on the Leased Premises to levy on the property of PI Advertising in place. To prevent the execution from occurring, PI Advertising filed its petition in the PI Bankruptcy that very day, September 22, 2014.[5]

63.    The petition was bare bones, without any schedules or a Statement of Financial Affairs ("*SOFA*"). The address given for PI Advertising in the bankruptcy petition was the Leased Premises, the same lease space being supposedly used by Exclusive at the time the writ was served and petition filed. Jerry Bryant, President of PI Advertising, signed the petition. When the schedules and SOFA in the PI bankruptcy were eventually filed, they were deliberately false in many particulars. Without limitation, the SOFA failed to disclose the Post-Garnishment Transfers (as defined below totaling over $1,100,000.00), the Exclusive Transfers, and other fraudulent transfers.

64.    At all times pertinent to this complaint, Jerry Bryant, Coety Bryant, PI Advertising, and Exclusive were "insiders" as to each other under Texas Business and Commerce Code § 24.002(7).

<u>**The March 2014 Garnishment Action**</u>

65.    On March 26, 2014,[6] Azar & Associates filed "Judgment Creditor's Second Amended Ex Parte Application For Postjudgment Writ of Garnishment" seeking to garnish accounts held by any of the judgment debtors at Frost National Bank, N.A. ("*Frost*"). The same day, the State Court signed an order authorizing issuance of the

---

[5] Case No. 14-42005; *In re: PI Advertising, Inc.*, In the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division.
[6] This was about six weeks after the Deposition Notice was served on Jerry Bryant.

writ.  The writ was issued by the Dallas District Clerk's office on March 28, 2014, and served on Frost on March 31, 2014.

66.     The writ of garnishment trapped funds held by PI Advertising in three different accounts at Frost totaling $13,116.71.  Ultimately, on May 2, 2014, an agreed judgment was entered in the garnishment action allowing Frost $1,000.00 in attorneys fees with judgment in favor of Azar & Associates for the remaining $12,116.71 of the garnished funds.

### The PI Advertising Transfers

67.     After learning of the garnishment, Jerry, Coety and Lauren Atkinson, conspired to and did transfer, hide and secret funds coming into PI Advertising as payment for its advertising services in order to prevent Azar & Associates from collecting the Judgment.   On information and belief, Tiffany Averitte, who also performed an accounting/secretarial function for PI Advertising, and who had check signing authority, also participated in the scheme to transfer, hide and secret PI Advertising's income after the garnishment.

68.      Without limitation, in April and May of 2014, $46,000, by two separate payments of $25,000 and $21,000, was transferred from PI Advertising's account at First Community Bank (the "*First Community Transfers*") to Lauren Atkinson.

69.     When Jerry Bryant was asked about the First Community Transfers by Christopher Moser, PI Advertising's bankruptcy counsel, at the meeting of creditors in the PI Bankruptcy on October 24, 2014, Bryant admitted that the payments were made to hide the money from Azar & Associates.

17

70.     Specifically, Bryant testified, as PI Advertising's CEO/President at the October 24th meeting of creditors, essentially as follows (emphasis added):

**Moser**:        Um, okay, transfers – we show payments to Lauren Atkinson of $25,000 and $21,000 in April and May of this year.  What's that about and why was it paid?

**Bryant**:                ***Um, hiding our bank accounts from – from Mr. Tinkham.***[7]

**Moser**:        Alright, your your  – the company was garnished, right?

**Bryant**:        Well, I – I – I don't know what you mean by the company was garnished, I mean the bank  – that particular bank account was garnished and obviously they knew our account numbers and such, ***so we started moving money around to – to – so we could continue, so we could continue to do business.***

* * *

**Moser**:        You gave her the money to pay the company bills so that the garnishment or the judgment creditor wouldn't take em.   ***Okay, well, well that's out there.***

**Bryant**:                Yes.

71.     Later in the same meeting of creditors, when Azar & Associates' counsel asked Jerry Bryant what had happened to PI Advertising's income subsequent to the garnishment of its Frost accounts, Bryant again admitted that the income was transferred to keep it hidden

72.     Specifically, Bryant testified essentially as follows:

**Tinkham**:      [W]hen a check came from say, Morris Bart, or whoever that was paying $30,000 a month, what physically happened to the check.

---

[7] By referring to Mr. Tinkham, Bryant was referring to the undersigned counsel for Azar & Associates who was representing Azar & Associates in its efforts to collect the Judgment. Therefore, what Bryant meant by this testimony was he was hiding PI Advertising's income from Azar & Associates.

Did you cash it and hold it in cash?  What happened to the money?  For all this $900,000 or so, whatever the figure is.

**Bryant**:  ***We hid it – we hid it from you is what we did*** with it. We, we – hold on …

**Tinkham**:  I know that, but what physically happened to it?

**Bryant**:  Let me talk and I will say, okay, let me finish.  You know I understand the question, you asked it three times now.  Okay, so what we would do is we would take the – we would take the check – first of all we had, we called all of our clients, and had – we had another entity that was not a – that was a d/b/a, and so we so they – they just took the word "Inc." off, so it was not PI Advertising, Inc. anymore it was just PI Advertising, we deposited that into an account, we let it clear and then we moved everything into a personal account from Lauren and paid all the bills from there.

**Tinkham**:  And so what was the name of the account?  I mean, pardon me, what bank was that account at?  The PI, not "Inc.," account?

**Bryant**:  Frost.

\* \* \*

**Tinkham**:  ***So all the money went into that account and then it was transferred to Lauren?***

**Bryant**:  ***Yes.***

73.  More recently, in a deposition of Jerry Bryant, taken on December 7, 2016, in the California registration action,[8] Jerry once again admitted to the fraudulent transfer of PI Advertising's income.  When asked why he had received two $6,500 wire transfers into his personal bank account in May 2016 from Lauren Atkinson, he responded:

**Bryant**:  Again, they're from the Company so – – you know[,]  [t]o be honest with you.  I think, not for sure, ***we used her account for a little bit***.  I – – I know this.  ***We used her account a little bit to keep Frank[9] from coming and swooping our accounts anymore***.  Because that happened once.

---

[8] As noted earlier, Azar & Associates registered the Judgment in California.  Around the time Exclusive was formed, Jerry Bryant moved to the Los Angeles, California area.
[9] "Frank" refers to Franklin D. Azar, the principal of Azar & Associates.

74.     Therefore, at least as late as May 2016, Jerry Bryant was receiving money from Lauren Atkinson that were the proceeds of the income diverted from PI Advertising to Lauren (and Coety, as explained below) as part of the scheme and conspiracy between Jerry, Coety, Lauren (and to a lesser extent, Tiffany Averitte) to prevent Azar & Associates from collecting the Judgment against PI Advertising.

### The Amounts of the PI Advertising Transfers

75.     Through discovery, Azar & Associates was able to obtain bank statements for an account at Frost jointly held by Coety Bryant and Lauren Atkinson (the "*Joint Account*").  These statements (the "*Joint Account Statements*" or the "*Statements*") reflect transactions between April 1, 2014 to October 1, 2014.  The last transaction shown on the Joint Account statements took place nine days after PI Advertising filed for bankruptcy – a closing debit in the amount of $1.38 to close out the Joint Account.

76.     Therefore, on information and belief, once PI Advertising filed for bankruptcy on September 22, 2014, and the Exclusive Transfers had occurred, the Joint Account was no longer needed to divert PI Advertising's income.  Consequently, the account was closed.

77.     The first transaction shown on the Statements is a "Teller Withdrawal" on April 1, 2014, in the amount of $98,960.00.  The beginning balance of the Joint Account on April 1, 2014, as shown by the April 24, 2014 Statement, was $98,970.66.[10]

_____

[10] Why the Joint Account existed as of April 1, 2014, is unknown to Azar & Associates.  The existence of the account is strange because it is an account held by two individuals who were married to others.  Therefore, Azar & Associates, on information and belief, asserts that the monies in the Joint Account as of April 1, 2014 (the "*Initial Balance*"), were also the proceeds of actual or constructive fraudulent transfers made by PI Advertising to Coety and Lauren.  It is possible that the Initial Balance was the result of Coety's and Lauren's embezzlement from PI.

Therefore, on information and belief, the Teller Withdrawal on April 1st was to prevent the monies already in the Joint Account from being comingled with PI Advertising's income that was thereafter deposited into the Joint Account.

78.     During the period of April 1, 2014, through September 22, 2014, the date PI Advertising filed for bankruptcy, the total deposits and credits into the Joint Account were $1,064,079.07 (the "*Deposits*"). When debit reversals and ATM credits totaling $15,700.26, as reflected on the Statements, are deducted from the Deposits, the net sum is $1,048,378.81 (the "***Joint Account Transfers***").

79.     On information and belief, the Joint Account Transfers were comprised of PI Advertising's income that received during the April through September 2014 time period that was deposited either directly or indirectly into the Joint Account with intent to hinder, delay or defraud Azar & Associates.  The Joint Account Transfers were made as part of the conspiracy between Jerry, Coety, Lauren, and Tiffany Averitte to prevent Azar & Associates from collecting the Judgment

80.     A large portion of the Joint Account Transfers were transfers from an account at Frost (account xxxxx0314, as reflected on the Joint Account Statements), which, on information and belief, was in the name of "Legal Productions, Inc. d/b/a PI Advertising, Inc." (the "***314 Account***").  On information and belief, the 314 Account is the account that Jerry Bryant referred to in the PI Advertising creditors' meeting when he testified:

> [W]e had another entity that was not a –  that was a d/b/a, and so we so they – they just took the word "Inc." off, so it was not PI Advertising, Inc. anymore it was just PI Advertising, we deposited that

---

Either way, on information and belief, there was no consideration received by PI Advertising for the Initial Balance transfers.

into an account we let it clear and then we moved everything into a personal account from Lauren….

81.     In addition to the transfers from the 314 Account into the Joint Account, there were multiple "Teller Deposits" of PI Advertising's income directly deposited into the Joint Account Statements.  Indeed, all $140,931.40 of the deposits made in April 2014 into the Joint Account were by Teller Deposits (which Azar & Associates understands to mean deposits made by PI Advertising's employees or agents physically taking checks or cash to a bank teller at a Frost branch bank).

82.     Combined, the First Community Transfers, the Joint Account Transfers and the Initial Balance transfer(s) (collectively, the "*Post-Garnishment Transfers*") total $1,193,338.81.  Accordingly, Jerry, Coety, Lauren, and Tiffany Averitte, working together in furtherance of their conspiracy, transferred nearly $1.2 million of PI Advertising's income within the six-month period prior to PI Advertising's bankruptcy filing to keep it out of the reach of Azar & Associates.

**The Post-Garnishment Transfers were Actually and Constructively Fraudulent**

83.     The Post-Garnishment Transfers were made with actual intent to hinder, delay or defraud PI Advertising's creditors, including, without limitation, Azar & Associates.

84.     The Post-Garnishment Transfers were each made by PI Advertising without receiving reasonably equivalent value in exchange for the transfers.  In fact, Coety or Lauren paid no consideration of any kind to PI Advertising in return for any of the Post-Garnishment Transfers.

85.     Further, PI Advertising was insolvent at the times of the Post-Garnishment Transfers or became insolvent as a result of the Post-Garnishment transfers.

86.     Further, at the times of the Post-Garnishment Transfers, PI Advertising (i) was engaged in a business for which its remaining assets were unreasonably small in relation to its business, or (ii) PI Advertising intended to incur, or believed, or should have believed, that it would incur debts beyond his ability to pay as they became due.

87.     At the times of the Post-Garnishment Transfers, PI Advertising was not generally paying his debts as they became due.

**The Formation of Prime Legal Leads, LLC**

88.     As stated above, PI Advertising's alter ego, Exclusive, continued to do business with Bill Green and Darryl Isaacs after PI Advertising's bankruptcy and the formation of Exclusive.  Bill Green's law firm is Green Law Firm, LLC (the "***Green Firm***"), which is based in South Carolina.  Darryl Isaacs's law firm is Isaacs and Isaacs, P.S.C. ("***Isaacs and Isaacs***"), which is based in Kentucky.

89.     In 2016, a dispute arose between the Green Firm and Exclusive related to Exclusive's work for the Green Firm under the Green Firm's Contracts with PI Advertising.  Similarly, a dispute arose between Isaacs & Isaacs and Exclusive related to Exclusive's work for Isaacs & Isaacs under the Isaacs & Isaacs's Contracts with PI Advertising.  This led to the Green Firm filing suit (the "***South Carolina Action***") in South Carolina against PI Advertising, Exclusive, Jerry Bryant and Coety Bryant on February 19, 2016,[11] and led to Isaacs & Isaacs filing suit (the "***Kentucky Action***") in Kentucky against PI Advertising, Exclusive, and Jerry Bryant on the very same day.[12]

---

[11] Case No. 2016-CP-40; filed in the Fifth Judicial Circuit Court of Common Pleas in Richmond County, South Carolina, filed at 4:46 p.m. EST.
[12] Case No. 2016 – CI – 00841; in the Circuit Court of Jefferson County, Kentucky, filed at 1:06 p.m. EST.

90.     Also on the same day, and minutes later, Exclusive filed suit in this Court in Civil Action No. 4:16-cv-00132-RC; styled *Exclusive Legal Marketing, Inc. v. Green Law Firm et al*. (the "**Texas Action**"), against the Green Firm, Isaacs & Isaacs, and multiple media companies.

91.     On March 29, 2016, Exclusive answered the Kentucky Action. On the same date, Exclusive filed a Suggestion of Bankruptcy and Notice of Automatic Stay (the "**Suggestion**").   In the Suggestion, Exclusive argued that due to Isaacs & Isaacs' allegations in its suit that Exclusive was the successor-in-interest to PI Advertising, Exclusive should be afforded protection under 11 U.S.C. § 362 due to PI Advertising's bankruptcy filing.  Although stating in its Suggestion that Exclusive "does not confess" that it was the successor to PI Advertising, the Suggestion makes no sense unless Exclusive was accepting the allegation as true.  Therefore, Azar & Associates asserts Exclusive should be judicially estopped from denying that it is a successor to PI Advertising.

92.     On April 20, 2016, Coety and Exclusive answered the South Carolina Action.  On the dame date, Coety also filed a motion to dismiss the South Carolina Action for lack of in personam jurisdiction.

93.     On April 25, 2016, Deana Bryant, Coety Bryant's wife, formed Prime Legal Leads, LLC ("**Prime**") by a filing with the Texas Secretary of State.  Therefore, Prime was formed less than a month after Exclusive answered the Kentucky Action and only days after Exclusive answered the South Carolina Action.

94.     The next day, on April 26, 2016, the Green Firm and Isaacs & Isaacs moved to dismiss the Texas Action (the "**Texas Motion**") on the basis that both the South

Carolina Action and the Kentucky Action were filed first in time before the Texas Action, and on the basis of the *Colorado River* doctrine.  In the Texas Motion, the Green Firm and Isaacs & Isaacs, and their principals, made the following statements (emphasis added):

> • "Plaintiff Exclusive Legal Marketing, Inc. ("Exclusive") is a successor entity to PI Advertising, Inc. ("PI Advertising")…." Texas Motion, p. 1.

> • "During or about the Fall of 2014, Jerry Bryant and/or Coety Bryant informed me that the law firm marketing services would be performed by a new entity which they created called Exclusive Legal Marketing, Inc. ("Exclusive"). Services were provided by Exclusive to Green Law Firm without any written contract." Declaration of Bill Green, Exhibit 1 to the Texas Motion.

> • After PI Advertising filed for bankruptcy,  "Jerry Bryant and Coety Bryant then started servicing PI Advertising's contracts with Green Law Firm and Isaacs & Isaacs through Exclusive.  According to the records of the Texas Secretary of State, [Exclusive] was formed on August 6, 2014, clearly in anticipation of PI Advertising's bankruptcy filing." Texas Motion, p. 4.

> • "PI Advertising … failed to disclose [in its bankruptcy schedules] its contracts with Green Law Firm and Isaacs & Isaacs. ***Moreover, PI Advertising failed to disclose that it has de facto transferred its contracts with Green Law Firm and Isaacs & Isaacs to Exclusive***.  To the contrary, PI Advertising declared in Question 14 of its Bankruptcy Statement of Financial Affairs that Exclusive was operating out of its leased location, but "no assets were transferred." Texas Motion, p. 5.

95.     Faced with strong evidence that Exclusive is the alter-ego of PI Advertising, and with Exclusive facing possible judgment liability in the South Carolina Action and in the Kentucky Action, Prime was formed (just as Exclusive was formed) to continue the business of PI Advertising under a different name to attempt to shield the business from PI Advertising's creditors.  Therefore, Prime was formed to perpetrate a

fraud on PI Advertisings' creditors, including Azar & Associates.   Consequently, Prime is an alter–ego of PI Advertising and Exclusive.

96.     On information and belief, Coety, Jerry and Deana Bryant all work for Prime, and perform the same or very similar functions to the functions they performed for Exclusive.

97.     Given the foregoing, it is clear that Deana Bryant was acting in conjunction with Jerry and Coety to further their overall conspiracy to form successor entities to carry on the business of PI Advertising under pseudonyms when needed to hinder, delay and defraud its creditors.

**The Formation of Paseo Miramar, Inc. and the Hannover House Deal**

98.     In March or April of 2013, Bryant finished writing a script for a movie entitled "American Justice."  On or about May 2013, "American Justice" filmed.  After post-production, the movie was finished in February or March of 2014.   Therefore, the movie was finished right about the time that Azar & Associates renewed its collection efforts by noticing Bryant's postjudgment deposition.

99.     Prior to finishing "American Justice," Jerry Bryant, individually, entered into a contract with Hannover House, Inc. ("***Hannover***"), a company based in Springdale, Arkansas, to distribute "American Justice," and as many as five other motion pictures, if the pictures were made and approved for distribution by Hannover.  Bryant set up a bank account under the name of "Paseo Miramar Pictures" at Frost to handle transactions related to the Hannover contract, including income and expenses related to "American Justice."        On information and belief, Paseo Miramar Pictures, which Jessica referred

to in her Declaration as "Paseo Miramar Films," was simply a name Jerry initially used to conduct his movie related business, and not a legal entity.[13]

100.    There was a press release relating to the Hannover contract in early June 2014.[14]  Three weeks before the press release, and not long after the movie was finished, Coety Bryant, conspiring with Jerry to prevent Azar & Associates from collecting the Judgment, formed Paseo Miramar, Inc. on May 14, 2014.  Thereafter, on information and belief, the Hannover contract transactions and monies were run through Paseo Miramar, Inc., instead of the Paseo Miramar Pictures bank account.

101.    Technically, on information and belief, there was no assignment of Jerry's rights under the Hannover contract to Paseo Miramar, Inc.  Nor was there an assignment of "American Justice" to Paseo Miramar, Inc.  Rather, Jerry operated out of Paseo Miramar, Inc. to prevent the Judgment from being collected.  Jerry has claimed that he gave all of his rights under the Hannover contract to his brother, Coety, and to Brian Loncar, a personal injury attorney.   Jerry has alternatively claimed that he retained an interest in the profits of "American Justice."  Jerry has stated that Coety and Brian Loncar put up the money to film "American Justice," but has never produced any documents to evidence that fact.  Given the foregoing, Paseo Miramar, Inc. was formed to perpetrate a fraud, and is therefore the alter-ago of Jerry Bryant.

102.    In his deposition, Don Fredrick Shefte ("**Shefte**"), President of Hannover House, Inc., testified that Jerry told him that Paseo Miramar was Jerry and Coety's production company, but Hannover never had a contract with Coety, only with Jerry

---

[13] Paseo Miramar is the name of the street in the Los Angeles, California area where Jerry was living at the time.

[14] The press release referred to a "six-picture distribution pact between Paseo Miramar *Studios* and Hannover House, Inc." (emphasis added).

Bryant and his wife. Shefte also testified that Jerry called him about six months before Shefte's deposition and told him (falsely) that the bankruptcy court had given ownership of Paseo Miramar to Frank Azar. About thirteen months before the Shefte deposition, Hannover, through a producer of a film called "Dancing, It's On," paid Exclusive $160,000.00.  This transfer, together with the other transfers of income derived from "American Justice" to Paseo Miramar, Inc., are collectively referred to as the "**Paseo Transfers**."  The Paseo Transfers represent monies that should have been paid to Jerry or, alternatively, to Jerry and Jessica, because the Hannover contract was not with Paseo Miramar, Inc. or Exclusive.   Indeed, neither Exclusive nor Paseo Miramar, Inc. existed when the Hannover contract was formed.

### The Paseo Transfers were Actually and Constructively Fraudulent

103.    The Paseo Transfers were made with actual intent to hinder, delay or defraud Jerry Bryant's creditors, including, without limitation, Azar & Associates.

104.    Jerry, by allowing Hannover or its agents to pay funds that should have been paid to Jerry to be paid to Paseo or Exclusive, made the Paseo Transfers without receiving reasonably equivalent value in exchange for the transfers.  On information and belief, neither Paseo nor Exclusive paid any consideration to Jerry or Jessica in return for the Paseo Transfers.

105.    Further, Jerry was insolvent at the times of the Paseo Transfers or became insolvent as a result of the Paseo Transfers.

106.    Further, at the times of the Paseo Transfers, Jerry (i) was engaged in a business for which his remaining assets were unreasonably small in relation to the

business, or (ii) Jerry intended to incur, or believed, or should have believed, that he would incur debts beyond his ability to pay as they became due.

107.    At the times of the Paseo Transfers, Jerry was not generally paying his debts as they became due.

### The Secretion of Personalty of PI Advertising

108.    On information and belief, based on the statements of Brad Johnson, who worked as a cameraman filming television commercials for PI Advertising, and who, on information and belief, worked in the same role with Exclusive, Jerry Bryant instructed Brad Johnson to hid personal property of PI Advertising's bankruptcy estate from Linda S. Payne, the Chapter 7 trustee of PI Advertising.  Brad Johnson complied with Jerry Bryant's instructions and did hide estate property (the "*Hidden Property*"), including, but not limited to expensive movie camera equipment with a value of at least $40,000, a Mercedes truck, and computer equipment (the property secreted by Brad Johnson is collectively referred to as the "*Hidden Property Transfer*.")  Brad Johnson opened a storage unit in his name to hide this property from the Chapter 7 trustee and her attorneys at Bryant's request.

### V.  CAUSES OF ACTION

### Request for Declaratory Judgment

109.    Azar & Associates incorporates by reference the allegations in paragraphs 1-108 of the complaint.  Azar & Associates seeks a declaration from the Court, pursuant to 28 U.S.C. §§ 2201 & 2202, that Exclusive and Prime are the alter-egos of PI Advertising and therefore that Exclusive and Prime are liable under the Judgment to Azar & Associates.  Additionally, Azar & Associates seeks a declaration from the Court that

Paseo Miramar, Inc. and any names under which Paseo Miramar, Inc. does business and any trade names/proprietorships used by Jerry Bryant in his movie business are the alter-egos of Jerry Bryant, and therefore therefor seeks a declaration that Paseo Miramar, Inc. and any trade names/proprietorships used by Jerry Bryant in his movie business are liable under the Judgment to Azar & Associates. Alternatively, Azar & Associates requests the Court find that Exclusive and Prime are successor entities to PI Advertising and are therefore liable under the Judgment.

### Actual and Constructive Fraudulent Transfer Action under Texas Business and Commerce Code §§24.005(a)(1) & (a)(2)(A) & (B) & §24.006(a) Against Coety and Lauren as the First Transferees of the Post-Garnishment Transfers, and against any Subsequent Transferees, and to Recover the Value of the Property Transferred

110.    Azar & Associates incorporates by reference the allegations in paragraphs 1-109 of the complaint.

111.    The Post-Garnishment Transfers occurred with four years of the date of this complaint.

112.    The Post-Garnishment Transfers are avoidable as actual or constructive fraudulent transfers under the provisions of the Texas Uniform Fraudulent Transfer Act ("*TUFTA*") as set forth in Texas Business and Commerce Code §24.001 *et seq*. Specifically, the Post-Garnishment Transfers are avoidable under TUFTA §§24.005(a)(1) & (a)(2)(A) & (B) & §24.006(a).

113.    Azar & Associates can recover the Post-Garnishment Transfers or the value of the Post-Garnishment Transfers from the first transferees of the Post-Garnishment Transfers and from any subsequent transferees other than those who took in good faith and for value.  TUFTA §§ 24.008 & 24.009.

30

114.    Coety and Lauren are the first transferees of the Post-Garnishment Transfers.  Accordingly, Azar & Associates requests that the Court enter a judgment against Coety and Lauren and any subsequent transferees in favor of Azar & Associates (i) avoiding the Post-Garnishment Transfers; and (ii) for the value of the Post-Garnishment Transfers.

115.    Because Coety was not a first transferee of the First Community Transfers, Azar & Associates is not seeking a judgment against Coety with respect to the First Community Transfers except to the extent he was a subsequent transferee.

116.    On information and belief, Coety and Deana Bryant, Lauren and Daniel McNeil, Brad Johnson and Tiffany Averitte, Prime, and Jerry are subsequent transferees of the Post-Garnishment Transfers, who did not take in good faith or for value, and Azar & Associates requests judgment be entered against each of them in the amount of the Post-Garnishment Transfers received by them.

**Actual and Constructive Fraudulent Transfer Action under Texas Business and Commerce Code §§24.005(a)(1) & (a)(2)(A) & (B) & §24.006(a) Against Exclusive as First Transferee of the Exclusive Transfers, and Against any Subsequent Transferees, and to Recover the Value of the Property Transferred**

117.    Azar & Associates incorporates by reference the allegations in paragraphs 1-116 of the complaint.

118.    The Exclusive Transfers occurred with four years of the date of this complaint.

119.    The Exclusive Transfers are avoidable as actual or constructive fraudulent transfers under TUFTA §§24.005(a)(1) & (a)(2)(A) & (B) & §24.006(a).

120.    Azar & Associates can recover the Exclusive Transfers or the value of the Exclusive Transfers from the first transferees of the Exclusive Transfers and from any

subsequent transferees other than those who took in good faith and for value.  TUFTA §§ 24.008 & 24.009.

121.    Exclusive is the first transferee of the Exclusive Transfers.  Accordingly, Azar & Associates requests that the Court enter a judgment against Exclusive and any subsequent transferees in favor of Azar & Associates (i) avoiding the Exclusive Transfers; and (ii) for the value of the Exclusive Transfers.

122.    On information and belief, Coety and Deana Bryant, Lauren and Daniel McNeil, Brad Johnson and Tiffany Averitte, Prime, and Jerry are subsequent transferees of the Exclusive Transfers, who did not take in good faith or for value, and Azar & Associates requests judgment be entered against each of them in the amount of the Exclusive Transfers received by them.

**Actual and Constructive Fraudulent Transfer Action under Texas Business and Commerce Code §§24.005(a)(1) & (a)(2)(A) & (B) Against Exclusive and Paseo as First Transferees of the Paseo Transfers, and against any Subsequent Transferees, and to Recover the Value of the Property Transferred**

123.    Azar & Associates incorporates by reference the allegations in paragraphs 1-122 of the complaint.

124.    The Paseo Transfers occurred within four years of the date of this complaint.

125.    The Paseo Transfers are avoidable as an actual or constructive fraudulent transfer under TUFTA §§24.005(a)(1) & (a)(2)(A) & (B) & §24.006(a).

126.    Azar & Associates can recover the Paseo Transfers or the value of the Paseo Transfers from the first transferees of the Paseo Transfer and from any subsequent transferees other than those who took in good faith and for value.  TUFTA §§ 24.008 & 24.009.

32

127.    Paseo and Exclusive are the first transferees of the Paseo Transfers. Accordingly, Azar & Associates requests that the Court enter a judgment against Paseo and Exclusive and any subsequent transferees in favor of Azar & Associates (i) avoiding the Paseo Transfers; and (ii) for the value of the Paseo Transfers.

128.    On information and belief, Coety and Deana Bryant, Lauren and Daniel McNeil, Brad Johnson and Tiffany Averitte, Prime, and Jerry are subsequent transferees of the Paseo Transfers, who did not take in good faith or for value, and Azar & Associates requests judgment be entered against each of them in the amount of the Paseo Transfers received by them.

### Action to Compel Turnover of the Hidden Property against Brad Johnson Under Texas Civil Practice and Remedies Code § 31.002

129.    Azar & Associates incorporates by reference the allegations in paragraphs 1-128 of the complaint.

130.    On information and belief, Brad Johnson is in possession of the Hidden Property, which was property of the estate of PI Advertising, and which is now owned by Azar & Associates under the PI APA.

131.    Azar & Associates requests that the Court order Brad Johnson to turn over the Hidden Property to the Collin County Constable or to a Court appointed receiver to be liquidated and applied against the Judgment, pursuant to Texas Civil Practice and Remedies Code § 31.002.

**Actual and Constructive Fraudulent Transfer Action under Texas Business
and Commerce Code §§24.005(a)(1) & (a)(2)(A) & (B) Against Brad Johnson as the
First Transferee of the Hidden Property Transfer, and against any Subsequent
Transferees, and to Recover the Value of the Property Transferred**

132.    Azar & Associates incorporates by reference the allegations in paragraphs
1-131 of the complaint.

133.    The Hidden Property Transfer from PI Advertising to Brad Johnson
occurred within four years of the date of this complaint.

134.    The Hidden Property Transfer is avoidable as an actual or constructive
fraudulent transfer under TUFTA §§24.005(a)(1) & (a)(2)(A) & (B) & §24.006(a).

135.    Azar & Associates can recover the Hidden Property Transfer or the value
of the Hidden Property Transfer from the first transferee of the Hidden Property Transfer
and from any subsequent transferees other than those who took in good faith and for
value.  TUFTA §§ 24.008 & 24.009.

136.    Brad Johnson is the first transferee of the Hidden Property Transfer.
Accordingly, Azar & Associates requests that the Court enter a judgment against Brad
Johnson and any subsequent transferees in favor of Azar & Associates (i) avoiding the
Hidden Property Transfer; and (ii) ordering the immediate return of the Hidden Property
Transfer or for the value of the Hidden Property Transfer.

**Conspiracy Action Against Jerry, Coety, Deana Bryant, Lauren, Daniel
McNeil, Brad Johnson, Tiffany Averitte, Exclusive, Prime, and Paseo**

137.    Azar & Associates incorporates by reference the allegations in paragraphs
1-136 of the complaint.

138.    As set forth above, at various times, dating from the service of the
Deposition Notice on Bryant's counsel in February 2014, Jerry Bryant has conspired with

his brother, Coety, and others, including without limitation Deana Bryant, Lauren, Daniel McNeil, Brad Johnson, Tiffany Averitte, Exclusive, Prime, and Paseo (collectively, with Jerry, the "*Conspirators*") to prevent Azar & Associates from collecting the Judgment. In particular, but without limitation, the Conspirators have transferred valuable property, cash, and income streams of PI Advertising and Jerry to make it appear that the Judgment could not be collected, have formed alter-ego corporate entities of Jerry and PI Advertising to hinder, delay and defraud the creditors of Jerry and PI Advertising, and have secreted the property of PI Advertising.

139.    The Conspirators have jointly agreed to take these actions to hinder, delay and defraud the creditors of PI Advertising and Jerry in the anticipation of personal benefit to themselves, either directly or indirectly.  Further, as set forth above, and on information and belief, the Conspirators have each benefitted from the conspiracy or conspiracies they have undertaken.

140.    These conspiracies have damaged Azar & Associates in the amount of the Judgment, and in the amount of attorneys' fees and expenses that Azar & Associates has had to expend to enforce the Judgment, including the fees and expenses incurred in its past and continuing participation in the Bryant bankruptcy and the PI Bankruptcy.  The attorneys' fees and expenses Azar & Associates has incurred to date in attempting to enforce the Judgment and in protecting its rights in the PI Bankruptcy and the Bryant Bankruptcy exceed $200,000.00.  As such, Azar & Associates seeks judgment against each of the Conspirators in the amount of the Judgment and in the amount of the attorneys' fees expended by Azar & Associates to date related to the collection of the

Judgment, and all attorneys' fees incurred by Azar & Associates forward until the Judgment is fully collected.

141.    But for the actions of the Conspirators, Azar & Associates would have been able to collect the Judgment, by, without limitation, the forced turnover or garnishment of the income stream from the PI Advertising Contracts or subsequent contracts between PI Advertising and its clients, had the alter-egos not been formed and the fraudulent transfers made.

## Request for Injunctive Relief

142.    Azar & Associates incorporates by reference the allegations in paragraphs 1-141 of the complaint.

143.    As set forth above, at least two alter egos of PI Advertising have been formed to hinder, delay and defraud it creditors.  Indeed, PI Advertising itself is nothing more than a successor to IMGRP Productions, Inc. ("***IMGRP***"), another debtor under the Judgment.  In his deposition in the California Registration Action, Jerry testified that IMGRP Productions, Inc., which is an acronym for Invision Media Productions, "used to be PI Advertising, Inc." He testified that IMGRP had the "same employees and same everything.  It was a different legal entity at one time."

144.    Given this track record of changing the name of what is, in essence, exactly the same business, it is a certainty that certain of the Conspirators will either form a new entity to carry on the business of IMGRP/PI Advertising/Exclusive/Prime or will use an entity already created by a Conspirator or Conspirators to carry on the business of IMGRP/PI Advertising/Exclusive/Prime.   In this regard, on information and belief, certain of the Conspirators have already formed dummy entities that can be used for this

purpose, including, without limitation, the following entities: Prime Webholdings Group, LLC, Loyalty Leads, LLC, Fieldstar Leads, LLC, Prime Edit Post Production, LLC.

145.    Accordingly, Azar & Associates requests that the Court enter an order granting Azar & Associates injunctive relief enjoining the Conspirators, and all those acting in concert with any of them, from secreting or transferring any property, income, rights, including contractual rights, and choses in action, held by Paseo, Exclusive, Prime, PI Advertising, Jerry, or any dummy entity used by the Conspirators to carry on the business of Exclusive or Prime, to any other person or entity without the express permission of this Court, and to further enjoin the Conspirators, and all those acting in concert with any of them,   from conducting the business of IMGRP/PI Advertising/Exclusive/Prime or any similar business (including without limitation, any business related to assisting personal injury attorneys and/or their law firms *in any manner*), under any other legal entity, without the express permission of this Court.

### Request for Turnover Against Exclusive and Prime under Texas Civil Practice & Remedies Code § 31.002

146.    Azar & Associates incorporates by reference the allegations in paragraphs 1-145 of the complaint.

147.    Exclusive and Prime, as the alter-egos of PI Advertising, earn income that cannot be readily be attached or levied on by ordinary legal process.  None of this income is exempt, as neither Exclusive nor Prime are a natural persons, and therefore neither is entitled to claim any exemptions under the Texas Property Code.  Garnishment is not effective to levy on this income as garnishment is simply not designed to seize a stream of future payments.  To enable such a seizure is one of the rationales for the Turnover Statute.  As stated in *World Fuel Services Corp. v Moorehead*, 229 F. Supp. 2d 584, 586

(N.D. Tex. 2002) (emphasis added), "[t]he statute was enacted to provide judgment creditors with a remedy to reach a judgment debtor's nonexempt property in cases where traditional methods had proved to be inadequate, including: … where the debtor owns interests in intangible property, such as contract rights receivable, accounts receivable, commissions receivable, and future rights to payments …."

148.    Upon an alter-ego finding by this Court, Azar & Associates seeks an order from this Court ordering Exclusive and Prime to turn over on a monthly basis to a Court-appointed receiver all income from any source received by Exclusive or Prime, or owned or controlled by Exclusive or Prime, or as to which either has a right to receive (even if not received), in the future, except for a reasonable sum to pay necessary salaries and expenses of the business.

149.    Additionally, Azar & Associates requests that Exclusive and Prime be required to immediately turn over to a Court-appointed receiver and to Azar & Associates the following documents (the "***Documents***"), within five days of entry of the turnover order:

(i)     Exclusive's federal income tax returns for tax years 2014 through 2016, together with all schedules and attachments, and all amended returns for such years;

(ii)    Prime's federal income tax returns for tax year 2016, together with all schedules and attachments, and all amended returns;

(iii)   Exclusive's complete general ledger for years 2014 through the date of the filing of this complaint;

(iv)    Prime's complete general ledger for years 2016 through the date of the filing of this complaint;

(v)     All periodic statements of account for all accounts held by Exclusive or Prime, whether or not in trust for another person or entity, or controlled by Exclusive or Prime, or as to which Exclusive or Prime otherwise had the ability to deposit or withdraw funds, at any financial institution, including without limitation, banks, savings and loans, credit unions, brokerage houses, and trust companies (collectively, "***Bank Accounts***"), ***together with*** (i) all checks drawn on each Bank Account during the statement period (including the front and back of all such checks), (ii) all deposits slips ***and*** items deposited to the Bank Account during the statement period, (iii) all wire transfers into or out of the Bank Account during the statement period, and (iv) all requests or other documents related to the wire transfers in or out of the Bank Account during the statement period, for the 36 months prior to the month in which the turnover order is entered.

150.    Pursuant to Texas Civil Practice and Remedies Code §31.002(b)(3), Azar & Associates requests that a Court-appointed receiver ("***Receiver***") be appointed to take possession of income required to be turned over by Exclusive and Prime under the turnover order, and to pay to Azar & Associates all the proceeds of same.  Azar & Associates also requests that the Court grant the Receiver broad powers to assist it in collecting the Judgment, including, without limitation, the power and the right to do the following actions: (i) to compel Exclusive and Prime and any officer, director, executive, owner, member or shareholder of either, and their respective spouses (as to natural persons), and any of the Conspirators (collectively, these individuals and entities are hereinafter referred to as "***Interested Parties***"), to appear before the Receiver to testify under oath or otherwise (at the Receiver's discretion) provide information requested by

the Receiver, (ii) to issue subpoenas to Interested Parties and to third parties, (iii)  to compel any Interested Party or third party to produce for inspection and copying any documents requested by the Receiver relating to Exclusive's or Prime's past, present, or future ownership of any real or personal property or income, or its affiliates', or control persons' or the control persons' affiliates' past, present, or future ownership of any real or personal property or income, and to do so on an expedited basis, (iv) to redirect the mail of Exclusive and Prime, (v) to cause the dissolution or liquidation of any entity owed in whole or in part by Exclusive or Prime, (vi) to take possession of and control all assets and income of any entity or person liable under the Judgment, or any judgment entered in this case, wherever situated, and to cause others to turn over to the Receiver such assets and income, including, without limitation, the right to direct personal injury attorneys, which are or were doing business with the Exclusive or Prime to turn over to the Receiver any income or profits owed to Exclusive or Prime, (vii) to exercise all rights and powers which could be exercised by Exclusive or Prime, including, without limitation, the right to obtain possession of documents and accounts within Exclusive's or Prime's possession, custody or control (such as bank account statements or tax returns), and (viii) to close any account in the  name of Exclusive or Prime including accounts held in trust or the benefit of others.

151.   Additionally, Azar & Associates requests that Exclusive and Prime each be required to turnover to the Receiver, on a monthly basis, by the fifth day of the following month, with a copy to Azar & Associates' counsel, an affidavit ("***Affidavit***"), signed by the control person of each under oath, verifying that each has fully complied with all terms and aspects of the turnover order, and that neither has diverted,

encumbered, transferred without consideration, or expended any income or property coming into its hands or under its control (even if it did not take possession of the income or property), other than under the terms of the turnover order. If any expenditure or transfer was not by a check drawn on Bank Accounts, then the Affidavit shall also state, as to each such expenditure or transfer, the amount of the expenditure or transfer, the purpose of the expenditure or transfer, the consideration for the expenditure or transfer, the recipient of the funds or transferee of the transfer, and the date of the transaction.

152.    Azar & Associates further requests such additional and alternative relief as may be granted by the Court under the provisions of the turnover statute, including without limitation, an award of attorneys' fees under Texas Civil Practice and Remedies Code § 31.002(e).

### Action Against Coety and Lauren for Breach of Fiduciary Duty and for Aiding and Abetting a Breach of Fiduciary Duty

153.    Azar & Associates incorporates by reference the allegations in paragraphs 1-152 of the complaint.

154.    Coety and Lauren performed the duties of officers of PI Advertising. Coety was the Chief Financial Officer of PI Advertising, according to Jerry's testimony at the contempt hearing in the State Court Case. Lauren similarly held a position of trust as PI Advertising's accountant and as the principal signer of checks on PI Advertising's bank accounts.  Both Coety and Lauren had a fiduciary duty to PI Advertising given their key roles in the business, both of which involved duties of loyalty and fair-dealing in undertaking corporate transactions.

155.    By making the Post-Garnishment Transfers and the Exclusive Transfers, and by aiding and abetting Jerry in making the Post-Garnishment Transfers and the

Exclusive Transfers, Coety and Lauren breached their fiduciary duties to PI Advertising.

Consequently, as the holder of the claims of PI Advertising under the PI APA, Azar &

Associates requests the Court enter judgment in its favor and against Coety and Lauren in

the total amount of the Post-Garnishment Transfers and the Exclusive Transfers, jointly

and severally, for their breach of fiduciary duty to PI Advertising and for aiding and

abetting Jerry's breach of his fiduciary to PI Advertising.

### Request for Attorneys' Fees and Costs

156.    Azar & Associates incorporates by reference the allegations in paragraphs

1-155 of the complaint.

157.    Azar & Associates requests an award of its reasonable attorneys' fees and

costs under Texas Business and Commerce Code § 24.013, under Texas Civil Practice

and Remedies Code 31.002(e), and under the common law.

**WHEREFORE**, Franklin D. Azar & Associates, PC requests the Court grant all

relief requested, including making the requested declarations, avoiding the fraudulent

transfers, and entering judgment against the defendants, jointly and severally.  Azar &

Associates further requests such additional and alternative relief as to which it may be

justly entitled.

> Respectfully submitted,
>
> MARTIN, DISIERE, JEFFERSON & WISDOM L.L.P.
>
> *Jeffrey G. Tinkham*
>  By: Jeffrey G. Tinkham, Of Counsel
>       State Bar No. 20056300
> Dale Jefferson
> State Bar No. 10607900
> Michael Watson
> State Bar No.  24008246

808 Travis St., 20th Floor
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile:  (713) 222-0101
tinkham@mdjwlaw.com
jefferson@mdjwlaw.com
watson@mdjwlaw.com

ATTORNEY IN CHARGE FOR PLAINTIFF,
FRANKLIN D. AZAR & ASSOCIATES, PC